of America, Oral Argument Not to Exceed, 15 minutes per side. Mr. Nelson for the Procisioner. May it please the Court, I'm Paul Nelson on behalf of Larry Tallent and I would like to proceed. Thank you, Your Honor. Mr. Tallent is currently serving a 35-year sentence following his guilty plea to several drug and firearm charges. That guilty plea was entered sometime after he had rejected or failed to comply with another plea agreement that the government had offered him, which he initially had signed, which the government candidly admits, pursuant to which he likely would have been facing a sentence of 7 or 8 years. They rejected or failed to comply. I thought it was just the latter. I thought it was just failed to comply. I guess the way I look at it, Your Honor, that essentially it's the same. That he... No, he was offered a deal, but he had to comply with, he had to cooperate and he did not cooperate, so they withdrew the plea bargain. Isn't that what happened? Well, it's my understanding, Your Honor, that he did provide some cooperation initially. Okay, but it was withdrawn because of his non-cooperation, because of his actions. That's not how I understand the record, Your Honor. As I saw it, that he had made a decision not to follow through, and that was the way it was characterized, that he was not going to follow through on that original agreement, perhaps not continue his cooperation, but in any event... Okay, in any event, I mean, it's not because he rejected it that he decided, I don't like this plea bargain, is it? That's fine, Your Honor. I mean, I'll... No, I mean, I... I guess I don't see... If there was a rejection, I want to know where it is. I don't know. Well, I guess I don't see an official rejection, something in writing saying, I reject this plea agreement. You said either or, I think. I think that you started out, he rejected or... Well, I guess using the or in terms of... I guess I used those two words interchangeably. Oh, okay. That he failed to follow through on the original plea agreement, and the only evidence in the record is that his failure to do so, he made that decision based on the advice that he had received from his original counsel. He made the decision not to cooperate because of advice of counsel? Yes, Your Honor, that's what he had indicated in his motion, and that's what he said, that his lawyer... Apparently, there was... The idea was that he would agree to cooperate. That would allow him to be... In exchange for that, the government would not seek detention. He would be back in the community where he could cooperate. At some point, he stopped cooperating. His lawyer told him that what we'll do, we can beat this. We'll file the motion to suppress. We'll go from there, and... I didn't think that he alleged his attorney told him not to cooperate, though. I believe that was in the statement that he made. That was how I read his testimony at the sentencing. Mr. Nelson, now I'm completely mystified about that because let's just assume for purposes of our discussion for a moment that there was deficient performance by an attorney somewhere along the line here. The allegations are that it was in connection with not properly advising him as to what sentence he really would have gotten and the strength of a potential motion to suppress. That's what I think the record says. That's what I thought we were talking about. Yeah, that's what it says. Yes. So let's assume that there was deficient performance there. Then we move on to prejudice, and in order to establish prejudice, you have to cooperate, and he would have gotten this lower sentence. But let's look at what actually happened. He enters into this plea agreement, then, which somewhere in the record it says he did so that he could be released unbind. So that's why he does it. Then he decides that he's not going to cooperate, so he stops cooperating. He testifies falsely at a suppression hearing, and he commits another crime in the meantime. Now, how on earth are you going to show prejudice in connection with the attorney advice, assuming that it was deficient? Well, I think the prejudice is that had he followed through on the original agreement, done what he... I think that was... It was his own free will to stop cooperating, lie at the suppression hearing, and commit another crime. The lawyer didn't make him do that. Well, no, the advice that he was given by his counsel. So you're saying that he... that his decision to commit perjury and another crime is justified by the misadvice about how long a sentence he would have gotten on another charge. That's the argument. Well, at that point, when he did those things that... It's my recollection that he was... The pending indictment was the original indictment. It hadn't been superseded at that point. But he made those decisions to follow through with this plan that was going to result in him beating the charges, and that was based on the fact... Beating the charges by virtue of testifying falsely at a suppression hearing. That you want to hang on the lawyer to? No, Your Honor, but the lawyer put him in that position, called him at the suppression hearing, and as he testified, that he felt he was sort of... I guess I'd characterize it as being between a rock and a hard place. But again, that's... And it chose the wrong place then, didn't it? Could we go back to Judge McKeague's original question? He said, let's assume ineffective assistance of counsel, but where is the prejudice? And your answer is, how was he prejudiced? Well, the prejudice is, as the cases say, that he's prejudiced by the fact that he ended up... He eventually received a sentence that was five times longer than what the government acknowledges he would have received had he followed through with the original plea agreement. But he made the decision not to follow through. Well, but that decision was made based on the advice that he had as well as the advice that was based on apparent lack of understanding of the potential exposure that he had here. Well, I can sort of understand your position of, in a hypothetical sense, let's say the lawyer said, you should renege on your plea agreement because now we'll file a suppression motion and I want you to lie and then we'll win the suppression motion. But you don't have enough money to pay me, so I want you to go out and commit a crime to earn some money to pay me. I sort of understand your argument in that fanciful hypothetical, but there's no evidence here that the lawyer had anything to do with him lying at the suppression hearing and or going out and committing another crime, which was in violation of the original plea agreement. So how do you show prejudice? Well, again, I think the looking at the time when he suffered the prejudice, which was when he was facing, had lost the opportunity to proceed under the original plea agreement. Because of his own free will, right? Not at that point. Initially, it was that he was not aware of what the potential exposure that he was facing, that he was looking at, and I believe he testified at the sentencing, and I believe it was agreed that they were initially talking about a maximum 15-year sentence. Is there any case that you can point us to that suggests prejudice arises out of somebody not doing what they were otherwise going to do and committing a crime? No. I don't, I'm not aware of any. But I think that's beyond the point where he suffered the prejudice. And our position would be that had he not, had he been properly advised at the outset, none of those other things would have occurred. He wouldn't have lied and he wouldn't have committed a crime. He would have been a good boy had he been properly advised of the exposure. Well, for one thing, that had that happened, had he followed through, there would not have been a suppression motion. So he wouldn't have had the opportunity to lie about that. And again, I would point out that at the sentencing, when Mr. Talent explained this to the judge in the context of trying to obtain the benefit of credit for acceptance of responsibility, he explained that to the judge. The judge characterized his And then the judge gave him credit for acceptance of responsibility. So I think that there's at least implicit in that conclusion by the district court that Mr. Talent's explanation of how this occurred had some truth to it. So what is the evidence that you're pointing to that he wouldn't have stopped cooperating and commit another crime? I'll just take the suppression hearing right off the table for a second. What's the evidence that he wouldn't have done those things had he been advised differently by his lawyer? Well, I'm not sure that there's any evidence in there other than what Mr. Talent said. Again, I don't... Well, Mr. Talent doesn't even say, I wouldn't have gone out and committed another crime, which would have been in breach of the plea agreement, right? No, that's correct. Even were we to believe him, he doesn't even make that claim. You just want to say, ipso facto, because there was misadvice, and let's assume that there was, therefore this prejudice, without ever having to get to whether he would have done all of these other things that are what really caused him to lose the availability of the better plea, right? Yes. Okay. And you agree there's no authority for that? I was not able to find any for that specific point. But again, I would point out, as we mentioned in our brief, with regard to, first, that this is an issue with regard to interpretation of the plea agreement, whether he's allowed to raise this claim at all, and whether that was barred by the plea agreement, and also, as we indicated in our brief, that when the district court ruled that it was barred by the plea agreement, but then also addressed what it perceived to be the merits, that, as we indicated in our briefs, that the issues, the decisions on the merits are just not correct. We think that that's wrong, and what should happen here is, at the very least, this should be sent back to the district court for some additional fact-finding to support, if no other reason, to have the attorney come in and explain to the court exactly what his role was in all of this. And that would not be necessary if we assumed deficient performance, correct? No, that would not be necessary. All right. I think then it would just be the question of the prejudice, and as we indicated, and I think the cases show, that prejudice, from the point of view of going from 7 to 8 years to 35 years, is sufficient showing of prejudice. All right. Thank you. Thank you. May it please the court, Perry Piper for the United States. The defendant's testimony at the sentencing hearing where he was ultimately sentenced, I think, is contained in the transcript at pages 1305 through the relevant parts through 1316, and it's clear at that time he's stating to the court, to Judge Mattis, that when I signed this original plea agreement, I really didn't want to cooperate. I didn't want to cooperate. Randy Rogers told me to sign the plea agreement, he'd get me out of jail. On page 1309 specifically, he said, I didn't want to cooperate. I didn't know what to do, but I signed this to get out of jail. When Mr. Nelson states that he originally cooperated, well, that's true because there's some, and we've included this in our brief, your honors, that when the defendant was arrested, his cell phone kept ringing from his customers, his methamphetamine customers. He was Mirandized. He agreed to cooperate at that point, long before the plea agreement ever came into existence, the first plea agreement. But after that, as the court notes, that when he signs his plea agreement, he does so as a strategic method for him to get out of jail, and then he's claiming that Mr. Rogers tells him, oh, I'm going to make mincemeat out of this case, and don't worry about it. Let me ask this. I just couldn't quite figure it out after looking at cases like this for almost 50 years. Really, your honor. I'm surprised by that. Really. What was he doing out on the street? Did you all agree to let him out so that he could, what, make some more buys? Mr. Neff and Judge Mattias discussed this very issue, your honor, and there's a debate among prosecutors about whether we should premise our recommendation for a defendant's release based upon their desire to cooperate. Personally, I've never done that. Neff says in here that he's done it twice, and both times it's backfired, and Judge Mattias even jokes, I guess you've learned a lesson, and Neff agrees. Mr. Neff agreed that he had, in fact, learned a lesson. So that's the reason why he was out on bond, is that Mr. Neff had agreed to release him if he agreed to cooperate. And so he was supposed to be out developing evidence on other cases, or? I think he was supposed to be assisting the agents, your honor, respectfully. I think that in the Eastern District of Tennessee, our judges do not allow proactive cooperation for a defendant who's already been charged. So I think you can go to locations and show them what's happened and perhaps point out other things, and it's easier for the agents, obviously. I know your honor is shrugging her shoulders, and I agree. I shrug my shoulders, too, because. I didn't shrug my shoulders. I am nodding my head negatively. I just, I can't imagine this. This is a serious set of charges. Judge. He's probably a meth addict himself. Horribly so, your honor. The meth thing is just a terrible situation in Tennessee, particularly East Tennessee. I just, that's all. I was just, I couldn't figure out what. I can invite the court's attention to that exchange between Judge Mattias and Mr. Neff if the court would like me to, but your honor raises a good point, and it's incredulous to me. And I've never done this, and Mr. Neff, it's not to disparage him because I love him, and he is a fantastic prosecutor. It's two times he's done it, and like he said, he's learned his lesson. I think as the court notes, I would like to. Obviously, if you let somebody out, there's a prospect that they're going to do bad things when they're out. There's no question, Judge. Now, is there any evidence here that the things that he was accused of having done, you know, that resulted in the first plea falling apart, he was doing at the request of the government? Oh, no, your honor. None whatsoever. So, the best argument would be they should have probably known he was going to do bad things because he's a meth addict. That's absolutely correct, Judge. It would have been far better for Mr. Talent to be remanded to custody, and even if he had failed to cooperate, he wouldn't have been in nearly as much trouble as he ultimately wound up in. So, assuming all that to be the case, then am I right that you still have to link what he did to prejudice to establish ineffective assistance of counsel? Yes, your honor. I believe you are correct. I would like to invite the court's attention to the Lafler case where it was, I think, a case out of Michigan where a defendant had shot a lady in the buttocks, I think as Forrest Gump would say, and his lawyer told him, you cannot be convicted of attempted murder because you're shooting below her waist. And there was some dispute in Lafler when you read about whether a defense counsel actually made that claim. I think the defense counsel may have kind of fallen on the sword a little bit in that case. But in any event, this case is so much far removed from Lafler, and that would be, as the court noted, not only did Mr. Talent lie at the suppression hearing and then later admitted it, Ms. Boggs, his girlfriend, lied. And she came in, and I looked for a copy of the grand jury transcript for Ms. Boggs, and I could not find it. Having said that, Judge Mattis noted that he was dissatisfied with her testimony at the suppression hearing. Judge Mattis heard the two suppression hearings in this case. And, for example, Ms. Boggs claimed at one of the suppression hearings when she testified that the defendant was her ex-boyfriend. And in some sense, that's true, because that would be like me referring to my wife as my ex-girlfriend. She is now elevated to another status. Ms. Boggs had actually married the defendant. The defendant knows this is going on, and not only does he perjure himself, he at least acquiesces in his then-wife perjuring herself, and I think a fair reading is that he suborns perjury. So the egregiousness of his conduct is so paramount in this case that the court would have a difficult time, I think, saying that regardless of the advice that he got, if indeed Randy Rogers gave him this advice, that he is not hoisting himself on his own petard, as it were, because he is the maker of these situations. I would note that Mr. Nelson talks about judgmentizing. Before you leave that... Yes, sir. If you define prejudice, as Mr. Nelson would, that he ended up getting a much higher sentence than he otherwise would have gotten had he done what he agreed to do, there's clearly prejudice. If you define prejudice as to whether or not he did the things that he did because of bad advice, then you may come to a different conclusion. So what authority have you found that would be beneficial to us, that would address whether prejudice can be established by virtue of these free-will decisions to go out and commit perjury and other crimes? I looked, Your Honor. I prided myself on my research capabilities, and I looked and looked and looked for a similar factual scenario and could find none, and that may be because nobody has raised this issue. And this was this week, by the way, that I looked, not when I was doing the briefing. It could also be because people don't usually get released. That may be so, Your Honor. That may be so, but people will perjure themselves even if they're in custody, so I have not found the legal definition of prejudice based upon a defendant who has, in fact, committed further crimes, including perjury, obstruction of justice. So I have not found that case, and I did look for it, Your Honor. I noted from the first argument this morning, I did note the four-part test that the court was talking about at the Tenth Circuit for miscarriage of justice, and I had actually found that case law. We haven't addressed that issue. I would like to say very briefly with respect to Judge Mattias and the acceptance of responsibility, first, he does say that he may have taken bad advice from Randy Rogers. He's not agreeing that he has, but I would also ask the court not to hold the district court's benevolence against it. In this case, he was an offense level 43, which is even under the advisory guidelines is a life sentence, and he gives him his acceptance of responsibility, knocks it down to 360 to life, and even Mr. Neff agreed in a moment of magnanimity to a low end of the guideline range, which Judge Mattias said, well, I'm surprised because I was going to give him more, and I do think that goes to the prejudice argument, Your Honor, that even though, as Mr. Nelson-Rotley says, and we candidly conceded then and now that he would have gotten far less time had he taken his punishment from the first round, came in and cooperated, but he didn't do that, and it was of at least his own making, regardless of what Mr. Rogers said. I can't imagine that Mr. Rogers would have said, perjure yourself, and then, although that's what the defendant says in the sentencing hearing testimony that Randy Rogers told him, then when Neff started cross-examining him, Mr. Talent says, I was blindsided, which one would think that a lawyer, if any reasonable talent, would have said, well, you're going to be cross-examined, and also, surprisingly to me, Mr. Talent then would be saying, well, Randy Rogers told Amanda Boggs to lie as well. I would also note that the plea agreement, and I'll end with this, the plea agreement does say that he waived any claim of ineffective assistance of counsel known to him at the time of the entry of the judgment. Both Dan Ripper, who's a very good lawyer in Chattanooga, and Mr. Talent get up and say, hey, we know this. We know that we took bad advice. So, unlike the scenario we had this morning, this is not a case where we're looking at something that happens post-sentencing. We're looking at something that happened pre-entry of the judgment. Both the defendant and the lawyer said, we know that he took bad advice. Unlike this morning, you waived your… That is absolutely true, Judge. …waiver argument by not having made it. That's true, although I do believe Judge Mattis says in his order that the defendant has waived this issue and then goes on to explain even if he hadn't waived it. And I've made a rookie mistake and I have not brought Judge Mattis' order on the 2255 with me. I keep things digitally now, which is a mistake. But he does say that in his memorandum opinion on the 2255. And I would also note that the defendant has bargained for something while the 35 years may seem harsh, and it is harsh. The defendant bargained for something very important in this case, and that was the dismissal of that second 924C, which would have given him an extra 25 years consecutive. If there are no further questions, I'll return to my seat. Thank you. Thank you. Mr. Nelson. Thank you, Your Honor. I guess sort of off the record, I have long believed from my own experience that sometimes the worst thing you can do for a client is to get them out on bond. I mean, there's just… I can't tell you how many times I've told people that. But I'll be, I guess, letting that go. One thing, with regard to this other criminal conduct, Your Honor, that currently, or that was pending at the time he was sentenced. It's my understanding that the alleged commission of that additional criminal conduct did not enter into the sentencing decision. And again, had Mr. Talent received proper advice at the outset, the suppression hearing never would have occurred. So I think from that point of view… …to take the perjury and the suppression hearing off the table, he still was obligated to cooperate with the police after he was released, pursuant to the terms of the plea agreement, and he declined to do that. Do I have that right? Well, he declined to do that, yes, Your Honor. But the question, again, is why he declined to do that. And his testimony, one thing, in fact, with regard to him saying his testimony that he did not want to… …that he did not want to, and I'm not quoting, did not want to or did not intend to cooperate when he first signed the plea agreement, that his testimony, page ID 1309, actually what he said was that he was told that if he turned himself in, that he would be released. And then he turned himself in. He was not released. He was mad. He felt he was lied to. And that was when he said, I'm not going to do this. But that was prior to having the plea agreement. So, again, the plea agreement was the way for him to get out, released on bond. As far as the waiver is concerned, the terms of the plea agreement, as we indicated, that, I mean, the government clearly is held to the language that it uses, that any, that it should be construed against the government if there's an ambiguity. And here, everyone's talking about, in fact, the government's brief said that his claim was based on facts that he knew prior to the entry of the judgment, which obviously is true, but that's not the question. The question is whether he knew he had a claim based on those facts. And there's nothing in the record that shows that he actually knew he had a claim of ineffective assistance of counsel at that time. Again, this, I think this is a very difficult case. I think it's very confusing. I think it's probably one that no one's seen before and hopefully probably we won't see again. And I think that there probably will be lawyers who will be using this case as sort of a lesson for their clients in the future. But we would, again, ask the court either to reverse the decision of the district court or man this case for an evidentiary hearing. Thank you. All right, thank you. Case will be submitted. That concludes the oral arguments this morning. You may adjourn the court.